NIGHT BOX
FILED

DEC 30 2002

CLERK, USDC / SDFL

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

## 02 - 81166

|  |  |
|---|---|
| PETER T. LOFTIN, | ) |
| Plaintiff, | ) CIV-MIDDLEBROOKS |
| | ) |
| vs. | ) MAGISTRATE JUDGE |
| | ) VITUNAC |
| KPMG LLP, FIRST UNION NATIONAL | ) |
| BANK/WACHOVIA CORPORATION, QA | ) |
| INVESTMENTS LLC and QUELLOS GROUP | ) |
| LLC, | ) |
| | ) |
| Defendants. | ) |

Plaintiff has alleged the following on personal knowledge as to matters that pertained to himself and upon information and belief upon all other matters. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.     This action is brought, *inter alia*, against defendants KPMG LLP ("KPMG"), First Union National Bank/Wachovia Corporation and QA Investments LLC ("QA Investments") for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and common law. Plaintiff seeks indemnification and damages from defendants for their violations of law.

2.     This cases arises from a tax strategy, called Foreign Leveraged Investment Program ("FLIP") and Offshore Portfolio Investment Strategy ("OPIS", together referred to as



"FLIP/OPIS") promoted and marketed by KPMG, First Union and QA to plaintiff and numerous other high net-worth individuals. KPMG, First Union and QA, individually and as co-conspirators, fraudulently marketed and sold to plaintiff, for fees, a tax-avoidance "strategy" that, unbeknownst to plaintiff, was an unregistered, illegal and improper tax shelter. Plaintiff entered into the tax planning strategy promoted and marketed by defendants in connection with plaintiff's federal income tax return for 1997. Defendants failed to disclose to plaintiff, among other things, that the tax strategy was an improper basis-shifting tax shelter which was likely to be found improper by the IRS and that KPMG had failed to register the tax strategy as a tax shelter with the IRS.

3.      Now, plaintiff's federal income tax return for 1997, which was prepared by KPMG,  is under audit by the United States Internal Revenue Service ("IRS") and plaintiff will be shortly negotiating a settlement of his tax liability with the IRS and may be assessed significant penalties.

## JURISDICTION AND VENUE

4.      The claims asserted herein arise under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 *et seq.*, and state law.

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1962 *et seq.* and 28 U.S.C. § 1331 and venue is proper in this District pursuant to 28 U.S.C. § 1391 (a) and (c) as plaintiff resides in this District. This Court has supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

## PARTIES

6.      Plaintiff Peter T. Loftin is a citizen of the United States and resides in Highland Beach, Palm Beach County, Florida.   He has been a resident of Palm Beach County since 1998.

7.      Defendant KPMG  is a worldwide firm of certified public accountants, auditors and consultants that provides a variety of accounting, auditing and consulting services.  KPMG, marketed and sold the tax strategy schemes alleged herein.  KPMG conducts extensive business in this District.

8.      Defendant First Union is a national bank now known as Wachovia Corporation. Throughout this Complaint, Wachovia will be referred to as "First Union."  Through its representatives, First Union used its confidential information concerning the financial assets of its clients to generate leads for KPMG and QA to promote and market their tax-avoidance strategy, as set forth herein.  First Union does substantial business in this District.

9.      (a)      Defendant QA Investments is a Delaware limited liability company with its principal place of business in Seattle, Washington.  Mr. Loftin entered into a QA Investments LLC Investment Advisory Agreement with QA dated September 3, 1997.

          (b)      Defendant Quellos Group LLC ("Quellos") is a Delaware limited liability company with its principal place of business in Seattle, Washington.  Quellos is the parent of QA and controlled QA at all relevant times.  Quellos also controlled Quadra Capital Management, LP, an affiliate of both QA and Quellos that was involved in the promotion and sale of FLIP/OPIS as described below.

          (c)      QA Investments and Quellos are collectively referred to herein as "QA".

## SUBSTANTIVE ALLEGATIONS

### KPMG Promotes Unregistered Tax Shelters

10.     In 1984, Congress enacted a comprehensive system to regulate the development, promotion and marketing of tax shelters.  That system was amended and modified by law and regulation in subsequent years.  Notably, the Secretary of the Treasury promulgated temporary regulations concerning, among other things, the registration of tax shelters and the creation and retention of lists of investors in tax shelters by the promoters and marketers of the tax shelter.

11.     In this regard, under 26 U.S.C. § 6111, a promoter of tax shelters is required to register each shelter with the IRS prior to offering the public the opportunity to participate in the shelter.  Pursuant to 26 USC § 6112, an organizer and/or seller of a tax shelter is required to keep a list of investors and provide it to the IRS within ten (10) days.  Failure to either register a tax shelter or maintain (or provide to the IRS) a list of investors subjects the tax shelter seller/organizer to potential penalties.

12.     In order to further the policies of the aforementioned provisions, the Secretary of the Treasury promulgated regulations under 26 U.S.C. § 6111 which authorize the IRS to publish a list of arrangements which it considers to be tax shelters subject to registration and disclosure. When the IRS publishes a notice listing such transactions as tax shelters, they are referred to as "listed transactions" and become subject to the requirements of 26 U.S.C. §§ 6111 and 6112.

13.     Since at least 1997, KPMG promoted and marketed a tax strategy called Offshore Portfolio Investment Strategy ("OPIS").  OPIS involves an arrangement to shift basis and generate a loss from the sale of stock and warrants, purportedly making use of Sections 302 and 318 of the Internal Revenue Code.  In Notice 2001-45, 2001-33 IRB 129, the IRS identified

4

OPIS as a listed transaction.  KPMG, however, never registered OPIS as a tax shelter under §
6111.

14.    Since at least 1997, KPMG also promoted and marketed a related tax strategy
called Foreign Leveraged Investment Program ("FLIP") KPMG has never registered FLIP under
§ 6111.

**Mr. Loftin Sells A Business, Has A Large**
**Capital Gain And Is Immediately Approached**
**By Defendants Concerning Tax-Avoidance Strategy**

15.    In 1997, Mr. Loftin was the sole shareholder of BTI Communications, Inc.
("BTI") – a regional telecommunications company located in Raleigh, North Carolina.  In the
summer of 1997, Mr. Loftin sold his interest in FiberSouth, a subsidiary of BTI whose ownership
was divided between Mr. Loftin and BTI, back to BTI.  That sale generated $30 million in
proceeds, which Mr. Loftin deposited to his account at First Union in Charlotte, North Carolina
through his private banking offices.

16.    Shortly thereafter, Mr. Loftin contacted First Union and advised them he was
doing a substantial transaction and wanted advice as to what to do with the proceeds.  At that
time, Mr. Loftin was not even considering tax shelters and was only deciding what to do with the
monies after taxes.  Mr. Loftin's First Union account representative suggested that he meet with
representatives of the bank to discuss tax planning for the monies Mr. Loftin had generated in the
sale of FiberSouth.  That meeting occurred on August 6, 1997, and was attended by Mr. Loftin
and First Union representatives Terry Hessling (a CPA and formally with Arthur Andersen), Jeff
Martin, Jeff Aremplenan, George Basin and Susan Jessup.  At that meeting, the First Union

representatives suggested that Mr. Loftin consider retaining KPMG for tax planning purposes in connection with the capital gains generated in the sale of Fibercell.

17.     The very next day, Mr. Loftin met at BTI's offices with various First Union representatives and representatives of KPMG Dale Baumann ("Baumann") and Carolyn Branan ("Branan"), both of whom were part of KPMG's "Personal Financial Planning Group" in Charlotte, North Carolina. At this meeting, Branan and Baumann presented Mr. Loftin with an investment strategy, which is described in detail below, and represented that he would have to retain the investment services of QA, which would along with legal opinions from large, well known firms arranged by KPMG and QA certify the "economic substance" of KPMG's tax strategy for Mr. Loftin and the operational aspects of the investments.

18.     At that meeting, KPMG told Mr. Loftin that he could make some money on the transactions to cover some of his investment costs and, at the same time  incur large capital losses on the investments to offset his other capital gains.  KPMG advised Mr. Loftin that the tax strategy complied with IRS rules and regulations.  Further, KPMG pressured Mr. Loftin by representing to him that "there were very few spots left" and therefore he would have to act quickly.  Moreover, KPMG told Mr. Loftin that he could not retain the services of any outside professional to counsel him as to the transactions as the tax strategy was "confidential."  When Mr. Loftin asked if he could have his personal lawyer Larry Robbins review the strategy and the proposed transactions, KPMG refused to permit it.  KPMG also represented to Mr. Loftin that the investment strategy being proposed by KPMG was a "no lose" proposition.  KPMG further promised Mr. Loftin a legal tax opinion, referenced above, that the goals of the investment could be accomplished as presented to Mr. Loftin in the event of any audit by the IRS and that KPMG

6

would provide Mr. Loftin with its own opinion as to the same.   In addition, at the meeting, Carolyn Branan told Mr. Loftin that if he was ever audited, KPMG would fight and win.  Mr. Loftin told Carolyn Branan that BTI was under audit by the IRS and that he could not afford any tax strategy that could expose him to additional scrutiny by the IRS.  Finally, First Union and KPMG told Mr. Loftin that he should retain KPMG to perform his accounting work and prepare his tax return as they would have the expertise necessary to efficiently prepare the return as a result of the added complexity in connection with this strategy.  In reliance on the representations made to him during this meeting, Mr. Loftin agreed to go ahead with the tax strategy proposed by KPMG and, later on, agreed to retain KPMG to perform his accounting work.

19.    During the meeting, defendants failed to disclose that: (i) that the tax strategy was subject to significant undisclosed tax risks including the possibility that the IRS would not only deny the capital loss, resulting in an increased tax liability and accompanying interest, but impose accuracy-related and other penalties; (ii) that the tax strategy should have been registered as a "tax shelter" with the IRS pursuant to 26 U.S.C. § 6111 and that KPMG and QA should have been listed as "promoters" as required by 26 U.S.C. § 6112; (iii) that based on the foregoing, it was not true that the tax strategy was a "no lose" proposition as it was subject to heightened and material risks that it would be deemed an abusive tax shelter; and (iv) that the above-referenced legal tax opinion was or would be a "more likely than not" opinion rather than an "unqualified" opinion, nor did they explain the difference.  Had Mr. Loftin been advised of the true risks associated with the tax strategy, he would not have agreed to implement it and, instead, would have availed himself of traditional tax planning strategies. Mr. Loftin met with First Union representatives between April 1997 and December 1997 for a total of at least eight meetings.

7

20.     It was further discussed at the August 6th meeting that in order to compensate First Union in connection with its role in advising Mr. Loftin as to the tax strategy, that Mr. Loftin would have to take a loan from First Union in the amount of $3.9 million.  In this regard, Mr. Loftin signed a loan agreement with First Union on September 2, 1997 and then, at the direction of defendants, directed that the proceeds of the loan be distributed as follows: $1,500,000 to Union Bank of Switzerland, New York Branch; $2,100,000 to BankAmerica International, NY; and $100,000 to First Union for "fees relating to Financial Consulting/Tax Strategy."

21.     In order to facilitate the tax strategy, KPMG had Mr. Loftin retain QA as his investment adviser.  Mr. Loftin and QA signed an investment advisory agreement, dated September 3, 1997.  Thereafter, according to the executed documents, and in spite of the fact that Mr. Loftin had no contact with them, QA then acted as an overall investment advisor to Mr. Loftin and arranged for the transactions described below.

22.     Before the end of the year, Mr. Loftin paid transaction fees associated with the tax strategy being implemented by KPMG and QA and, furthermore, by execution of documents prepared and presented to him by defendants, without explanation, authorized Larkhaven Capital, as described below, to pay defendants fees in connection with the tax strategy.

**KPMG And QA Implement The Tax Strategy**
**Through A Series Of Complex Foreign Transactions**

23.     The tax strategy involved the following transactions carried out from September to the end of 1997 by QA and KPMG on behalf of Mr. Loftin:

(a) On September 16, 1997, KPMG and QA arranged for Mr. Loftin to purchase a warrant from Larkhaven Capital Inc. ("Larkhaven") , a foreign corporation organized under the laws of the Cayman Islands, for 4,250 shares of Larkhaven at a price of $2,100,000.  The warrant expired on September 30, 1998 and entitled Mr. Loftin to either (i) exercise the warrant, or (ii) settle the warrant based upon a "put" value which would be based on the net asset value of Larkhaven multiplied by the percentage of Larkhaven covered by the warrant;

(b) On September 16, 1997, Mr. Loftin purchased 1,408 shares of UBS, a foreign bank at a price of $1,064.81 per share for a total of $1,499,246;

(c) At the time of commencing the tax strategy, Larkhaven had commitments in place from UBS to finance 100% of Larkhaven's purchase of UBS shares.  The financing was at market interest rates.  Larkhaven  purchased 28,392 shares of UBS on September 16, 1997, at a price of CHF (Swiss francs) 1,528 per share for a total price of over $29 million;

(d) On September 16, 1997, Larkhaven sold European-style"call options"to UBS at a strike price of CHF (Swiss Francs) 1,451.60 per share for the bank to purchase its shares and an expiration of November 5, 1997.  Embedded in the call options was a daily digital option feature called a "RECAP" option -- this entitled Larkhaven to earn a fixed daily payment for each day that the price of UBS closed above a pre-defined level;

(e) On November 5, 1997, UBS were trading at CHF 1,708 (Swiss Francs).  UBS exercised its call option and purchased 29,610 shares of its stock from Larkhaven at the strike price of CHF (Swiss Francs) 1451.60 per share.  There was no written agreement between Larkhaven and UBS that required UBS to redeem its shares;

9

(f) Also on November 5, 1997, Mr. Loftin purchased directly from UBS 28,392 over-the-counter call options on UBS shares in order to maintain his overall portfolio position in UBS shares.

(g) On November 25, 1997, Mr. Loftin's call options expired without having been exercised;

(h) On December 10, 1997, Mr. Loftin elected to put his warrant back to Larkhaven for its value of $2,048,857; and

(i) Mr. Loftin sold 1,267 shares of UBS for $1,835,402 on December 22, 1997, yielding a profit of approximately $486,294.

24.     The aforementioned transactions were designed to effect a "basis shift" from the redeemed UBS shares held by Larkhaven to the UBS shares held by Mr. Loftin, which "basis shift" enabled Mr. Loftin to recognize a capital loss on the subsequent sale of his UBS shares. The aforementioned transactions were done at the direction of KPMG and QA and their agents.

25.     In October 1998, Mr. Loftin filed his federal income tax return for 1997 which was prepared by KPMG.  The return was timely filed with the IRS and reflected over $27,416,629 in capital losses in 1997 from the tax strategy.

**KPMG, QA and First Union Worked Together
To Conduct The Fraudulent Scheme Alleged Herein**

26.     KPMG and QA jointly promoted and marketed various tax strategies, including the FLIP/OPIS program described herein.  First Union actively participated in their efforts by actively generating leads for KPMG and QA and recommending to its clients, after obtaining confidential

10

information concerning potential or actual capital gains, that they meet with KPMG and QA to discuss tax planning issues.

27.     In order to facilitate the scheme, QA, which understood the premise of the tax strategy and how it worked, arranged for the transactions described above.  Defendants also arranged for QA to be investment adviser to Larkhaven, which retained QA as an investment advisor by agreement dated September 15, 1997.  In this way, QA had control over all aspects of the transactions and could ensure that the transactions were implemented according to the tax strategy defendants had designed for Mr. Loftin and others.  QA arranged for all of the transactions described above and corresponded with UBS on behalf of Mr. Loftin to arrange for the transactions.  Similarly, QA corresponded with UBS on behalf of Larkhaven.

28.     In addition to the actions described herein, KPMG also prepared Mr. Loftin's 1997 tax return.  In this way, the transactions were not subjected to the scrutiny of a truly independent tax preparer that could examine the transactions to determine if they were legal and appropriate. In order to further insulate itself and shield itself from potential liability, KPMG arranged for a nationally-known law firm, Brown & Wood, to prepare and provide to Mr. Loftin an opinion letter which opined as to the purported legality of the tax strategy.  In addition, KPMG fraudulently induced Mr. Loftin to sign an agreement, dated August 15, 1997, which purports to indemnify KPMG and limits their liability should any adverse legal action take place with respect to the tax strategy.  This agreement is null and void and should be disregarded as it was fraudulently induced -- KPMG, as described above never disclosed certain material facts to Mr. Loftin and he would have never agreed to the indemnity or other inter-twined elements of the scheme had he known the truth.

29.     First Union was integral to the scheme alleged herein as it introduced Mr. Loftin to KPMG and QA.  In addition, First Union's representatives participated in at least eight meetings with Mr. Loftin in 1997 in an attempt to garner him as a client for KPMG.  KPMG performed substantial auditing and consulting services for First Union before, during and after the events set forth herein.  In addition, First Union obtained a $100,000 fee for its services as well as the interest on the loan First Union provided as alleged above.  Upon information and belief, First Union introduced many other high-net worth individuals to KPMG and QA with respect to the tax-avoidance strategy described herein.

**The IRS Cracks Down On**
**Basis-Shifting Tax Shelters**

30.     On July 26, 2001, the IRS issued Notice 2001-45 (2001-33 irb 129) regarding "Basis Shifting Tax Shelters."  The IRS notice provided that certain types of transactions utilizing foreign corporations could be subject to disallowance for tax purposes, interest on unpaid taxes and possible penalties against tax payers, tax return preparers and promoters.

31.     In October 2000, the IRS made a formal information request of Mr. Loftin and initiated an audit of his 1997 tax return.  In connection with the IRS's request, KPMG negotiated with the IRS on Mr. Loftin's behalf concerning the tax strategy.

32.     As KPMG represented Mr. Loftin in connection with the IRS audit, KPMG has not challenged the IRS's characterization of the Transaction, and KPMG has encouraged him to settle with the IRS based on the IRS' settlement proposal.  In connection with the IRS's request, KPMG negotiated with the IRS on Mr. Loftin's behalf concerning the tax strategy.  Mr. Loftin has

now committed to pursue settling his tax liability with the IRS and will likely have to pay substantial tax repayments, plus undetermined interest and is subject to potential penalties.

## FIRST CLAIM

### (Racketeer Influenced and Corrupt Organizations Act)

33.     Plaintiff repeats and realleges each and every allegation set forth above.  This claim arises under 18 U.S.C. §§1962(c) and (d) against all defendants.

34.     At all relevant times, KPMG, QA and First Union were a "person" within the meaning of 18 U.S.C. §1961(3), and "capable of holding a legal or beneficial interest in property." At all relevant times, KPMG, QA and First Union constituted an "Enterprise" within the meaning of 18 U.S.C. §1961(4).  In its tax consulting business, KPMG closely worked with QA for QA to handle the "economic substance" of the transactions and to oversee the operational steps and payment of money.  First Union coordinated closely with KPMG and rendered marketing and financial assistance.

35.     The purpose of the Enterprise was to solicit and represent current and prospective clients and maximize profits through the fees charged for KPMG's, First Union's and QA's services.  The Enterprise functions as a well-planned tax avoidance scheme.  Initially, a prospective client seeks tax advice.  KPMG involves QA for the actual investment, which is expected to generate a positive return or to yield a capital loss that offsets capital gain from other investments.  KPMG and QA then work together to effectuate the complex transactions and for KPMG to prepare the tax return.  In this case, Brown & Wood was retained in an attempt to deflect the taxpayer's independent inquiry and to allow the taxpayer's any IRS challenges by issuing its concurring tax opinion.  The Enterprise is an ongoing organization.  The Enterprise has

13

an ascertainable structure and purpose beyond the scope of the predicate acts and their conspiracy to commit such acts. The Enterprise has engaged in, and its activities have affected, interstate and foreign commerce. Each Defendant has been associated with the Enterprise. Each Defendant helped to direct the Enterprise's actions and manage its affairs. Each Defendant conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C.1962(c).

36.     Defendants' multiple predicate acts of racketeering include mail and wire fraud in violation of 18 U.S.C. §§1341 and 1343. Defendants engaged in multiple schemes to defraud consumers by marketing, establishing, and promoting tax avoidance benefits and willfully misrepresenting or failing to disclose material facts about "tax strategies" to such clients. Defendants executed or attempted to execute such schemes through the use of the United States mails and through transmissions by wire is interstate commerce. Defendants committed many predicate acts from September 1997 through January 2002 in furtherance of their scheme to defraud Mr. Loftin, as described above, and as set forth below:

(a)     On September 2, 1997, QA sent a letter to Mr. Loftin which enclosed a copy of an investment advisory agreement and provided, among other things, wiring instructions to be "utilized to fund the UBS Securities LLC brokerage account." The facsimile was incidental to the scheme to defraud alleged herein;

(b)     On September 5, 1997, Susan Jessup, Vice President of First Union, sent a letter to Mr. Loftin which confirmed the transfer of monies from the proceeds of the loan Mr. Loftin had taken from First Union to UBS, First Union and BankAmerica International, as described above. The letter was incidental to the scheme to defraud alleged herein;

14

(c)     On May 15, 1998, Dale Baumann sent a facsimile to Mr. Loftin which attached a draft of a tax opinion letter on Mr. Loftin's "direct and indirect purchase of UBS stock." The letter was incidental to the scheme to defraud alleged herein;

(d)     On June 8, 1998, KPMG sent Mr. Loftin an opinion on the "consequences of certain investment portfolio transactions that you" entered into in September 1997. The opinion letter contained numerous materially false and misleading statements regarding Mr. Loftin's knowledge concerning the transactions;

(e)     On June 15, 1998, Brown and Wood, LLP sent a concurring tax opinion via U S. Mail to Mr. Loftin at KPMG's direction. The opinion was premised on factual representations that KPMG knew to be false;

(f)     In 1998, KPMG knowingly prepared an illegal and fraudulent tax return for Mr. Loftin. KPMG was aware that Mr. Loftin would rely on its representation of this tax return as legal and place it in the mail. Mr. Loftin filed his 1997 tax return by placing it in the U.S. Mail in October 1998.

(g)     In late summer 2001, following the IRS Notice, KPMG attempted to conceal KPMG and QA's fraudulent scheme by recommending that Mr. Loftin negotiate a settlement with the IRS and pay a portion or all of the tax to avoid penalties and interest.

37.     Defendants engaged in multiple schemes to defraud consumers by establishing, and promoting tax avoidance benefits and willfully misrepresenting or failing to disclose material facts about "tax strategies" to such consumers. Defendants also conspired to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d). Many phone calls, mailings, facsimile transmissions and wire transfers were made across state lines from North Carolina to Florida, and New York to

Florida and North Carolina, which meet the minimum burden of showing an effect on interstate commerce. In addition, the transactions included offshore investments in a Cayman Islands corporation and purchases and sales of shares in Union Bank of Switzerland, a large Swiss bank, which involved mailings and wire transfers that affected foreign commerce.

38.     Defendants' acts from a "pattern"of racketeering activity. They have been related in their common objectives to maximize profits, conspire to evade the internal revenue law by marketing and establishing "tax strategies" through use of false and misleading information, and conspire to defraud clients regarding the tax consequences of such strategies. These acts have had the same or similar purposes, results, participants, victims, and methods of commission. Defendants' pattern of racketeering activity dates from at least mid-1997 and continues to the present, and threatens to continue in the future. The predicate acts of the defendants all are clearly related to the effort to fraudulently induce unsuspecting clients, including Mr. Loftin, into using the KPMG/QA Tax Strategy or the FLIP/OPIS Transactions. Defendants were in the business of marketing this and similar tax shelters to hundreds of high net-worth potential investors. Defendants have engaged in the unlawful conduct over the years and have depended on it as a major source of business and profit. The predicate acts involve different victims at different points in time, all as one aspect of defendants' way of doing business.

39.     Defendants participated since fall 1997 and through 2002 in a pattern of racketeering adversely affecting Mr. Loftin and similarly situated prospects and clients. The predicate acts of defendants all are clearly related to the effort to fraudulently induce unsuspecting clients into using the tax-avoidance strategy detailed herein. Mr. Loftin and his counsel have learned that the transactions were called the "Foreign Leveraged Investment Program" ("FL1P")

16

within KPMG and were marketed and "sold" to many high net worth individuals over several

years.  It was standard operating procedure for KPMG and QA to demand that their clients sign

nondisclosure agreements concerning FLIP/OPIS.  Many of these individuals have retained legal

counsel, who are participating in a "Alliance Group" in discussions with the IRS.  For example, an

article in *Forbes* magazine reported that the IRS "says hundreds of wealthy taxpayers. . . used

variants of the same tax shelter to generate <u>several billion dollars in artificial capital losses, which</u>

<u>then offset 'real gains.'</u>" *Forbes*, April 1, 2002, at 40 (emphasis added).

40.     The IRS Petition in *United States v. KPMG LLP*, Case No. 1:02MS00295

(D.D.C.), and accompanying privilege log prepared by KPMG reveal the names of approximately

160 other taxpayers who were solicited and fraudulently induced into investing in FLIP/OPIS

transactions.  Attached to the IRS petition, there are copies of written agreements and

engagement letters between KPMG and QA relating to the development, promotion and

implementation of the tax avoidance strategy detailed herein.

41.     Encouraged and enriched by its success in 1997 promoting the tax avoidance

strategy to Mr. Loftin and FLIP or OPIS Transactions to other taxpayers, KPMG increased its

promotional efforts in 1998.  KPMG aggressively marketed its tax strategies at a "Wealth

Management" seminar sponsored by KPMG in Phoenix, Arizona in 1998.  The seminar was

targeted at high net worth individuals, both existing and prospective KPMG clients, who might be

vulnerable to KPMG's marketing of tax avoidance "products."  KPMG promoted its tax

strategies as using IRS's complex rules against it.  KPMG touted the investment advisory role of

QA and another firm formed by principals who left QA, Presidio Advisors, LLC.  Based on the

KPMG Wealth Management conference and extensive promotional efforts by Carolyn Branan and

others at KPMG, many taxpayers were defrauded into participating in FLIP or OPIS transactions in 1998 and 1999.

42.    The pattern of racketeering activity caused damages to Mr. Loftin and other clients of defendants, who were defrauded by defendants' failure to disclose the substantial risks involved and KPMG's and QA's assurances that the tax strategies were legitimate tax avoidance steps that did not have to be registered as tax shelters with the IRS.

43.    The pattern of racketeering activity, including the mail and wire fraud, were all committed in an effort to induce Mr. Loftin to invest in the transactions and in turn pay millions of dollars in fees and related expenses to the Enterprise.

44.    As described herein, defendants' predicate acts of mail and wire fraud were committed by defrauding customers, misrepresenting material facts, and failing to disclose material risks. Had it not been for those fraudulent misrepresentations, Mr. Loftin would not have invested in the tax-avoidance strategy. This would have saved him millions of dollars in fees, prevented an IRS audit, avoided the need to hire a new accountant and to incur legal fees, and avoided the need to pay additional tax liability, interest and possibly penalties. Mr. Loftin would also have been able to pursue reasonable and legitimate tax planing strategies. The conduct of defendants was the direct and immediate cause of Mr. Loftin's misinformed decision to invest his money in the fraudulent tax-avoidance strategy. Defendants conspired to defraud Mr. Loftin and other taxpayers in violation of 18 U.S.C. §1962(d).

45.    As a direct and proximate result of defendants' violations of 18 U.S.C. §1962(c) and (d), Mr. Loftin and others have been injured in their business and property. Pursuant to 18

U.S.C. §1962(c), Mr. Loftin seeks recovery of treble damages, the costs of bringing this lawsuit, and reasonable attorneys' fees.

## SECOND CLAIM

### (Fraud Against All Defendants)

46.    Plaintiff repeats and realleges paragraphs 1-32 above as if fully set forth herein. This claim is brought against defendants KPMG and QA for fraud and First Union for aiding and abetting that fraud.

47.    First Union, KPMG and QA made numerous material misrepresentations and failed to disclose material information to plaintiff.

48.    At the time that First Union, KPMG and QA made these misrepresentations or omissions of fact, they knew or were reckless in not knowing that such representations and omissions were false and misleading.  Defendants knew such information was material and knew of the information that was not disclosed, as described above.  Moreover, defendants had a duty to plaintiff to disclose such facts, and to ensure that all of their statements and representations were complete, truthful, and not false or misleading.

49.    Plaintiff was unaware that First Union's, KPMG's and QA's representations and omissions were false and misleading and that defendant had not disclosed material information. Plaintiff reasonably relied on the representations, and relied on information provided by defendant without knowing of defendant's omissions, and plaintiff was thereby detrimentally affected, as described herein.  Plaintiff was unaware of defendant's material misrepresentations and nondisclosures, and could not have discovered them through reasonable diligence as a result of

defendants' conduct in fraudulently concealing their wrongdoing, as described more fully in this complaint.

50.     First Union, KPMG and QA intended for plaintiff to rely on the foregoing misrepresentations and omissions of fact, as set forth in this complaint.

51.     In addition, First Union provided KPMG and QA substantial assistance in the commission of the fraud, knowing of the underlying wrongdoing.

52.     By reason of the foregoing, plaintiff is entitled to compensatory damages in the amount to be determined at the trial of this action.

53.     Defendants' misconduct described in this action was done willfully and with knowing and conscious disregard of the rights of plaintiff, with the intent to vex, injure, or annoy plaintiff, so as to constitute oppression, fraud, or malice.  Plaintiff is entitled to receive punitive damages in an amount appropriate to punish or set an example of defendants.

### THIRD CLAIM

### (Breach of Fiduciary Duty Against KPMG and QA)

54.     Plaintiff repeats and realleges paragraphs 1-32 as if fully set forth herein.  This claim is brought against defendants First Union, KPMG and QA for breaches of fiduciary duty.

55.     Defendants owed plaintiff fiduciary duties, including the duty of good faith and fair dealing, the duty of full disclosure, and the duty of care arising out of their relationship with plaintiff as alleged more fully above.

56.     Defendants held and continue to hold a special relationship with plaintiff.

57.     Defendants had a duty to provide complete and truthful information to plaintiff when offering the tax strategy described herein.

20

58.     In addition, First Union provided KPMG and QA substantial assistance in the commission of the breaches of fiduciary duties alleged herein.

59.     All defendants engaged in the aforesaid misconduct both individually and by aiding and abetting each other in the commission of the wrongs.  By engaging in the conduct alleged herein, defendants breached their fiduciary duties to plaintiff, by misrepresenting or omitting and failing to disclose, while under a duty to do so, the numerous material facts set forth more fully herein.

60.     As a result of defendants' breaches of fiduciary duty, plaintiff is entitled to compensatory damages in an amount to be determined at trial.

## FOURTH CLAIM

### (Negligent Misrepresentation Against KPMG and QA)

61.     Plaintiff repeats and realleges paragraphs 1-32 as if fully set forth herein. This claim is brought against KPMG and QA.

62.     Defendants KPMG and QA falsely stated and misrepresented to plaintiff, through memorandum, presentations and materials approved, prepared and disseminated by them, that the tax strategy, described herein, was proper and legal.

63.     At the time defendants KPMG and QA made these misrepresentations, they were both material and false.

64.     These statements and representations were negligently made by defendants KPMG and QA without reasonable grounds to believe that they were true.  Plaintiff reasonably relied on defendants' misrepresentations.  If defendants had not made those misrepresentations, plaintiff would not have entered into the tax strategy, described herein.

65.     Defendants KPMG and QA reasonably should have known that plaintiff, at the time these representations were made, did not know the truth but believed defendants' representations to be true, reasonably relied upon them, and were thereby induced to enter into the tax strategy described herein.

66.     Defendants KPMG and QA reasonably should have known that plaintiff would suffer injury from engaging in the tax strategy described herein.  Plaintiff was injured as a result thereof.

67.     Based on defendants' and/or defendants' agents' relationship with plaintiff, defendants owed plaintiff a duty of care to act with reasonable skill and diligence in conducting business, which duty defendants breached. By reason of the foregoing, plaintiff is entitled to compensatory damages in an amount to be determined at the trial of this action.

## FIFTH CLAIM

### (Malpractice Against KPMG)

68.     Plaintiff repeats and realleges paragraphs 1-32 as if fully set forth herein.

69.     KPMG owed a duty to plaintiff to use the skill and care of a reasonably competent accountant and tax consultant.  KPMG owed a duty to plaintiff to perform professional accounting, financial planning and tax consulting services in a proper, skillful and careful manner.

70.     KPMG intentionally, recklessly and/or with negligence or  gross negligence breached its duty owed to plaintiff to act with the care and skill of a reasonably competent accountant and tax consultant.

71.     KPMG intentionally, recklessly and/or with negligence or gross negligence breached its duty owed to plaintiff by other acts and omissions including those acts and omissions previously alleged.  KPMG's breach of duty alleged above constitutes malpractice.

72.     As a direct and proximate result of KPMG's malpractice, in violation of the standard of care or skill required of a reasonably competent accountant and tax consultant/preparer, plaintiff has incurred economic and consequential damages.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

(a) Ordering that defendants indemnify and reimburse plaintiff for any and all additional tax liability, interest and penalties assessed or that may be assessed against plaintiff relating to plaintiff's 1997 federal income tax return;

(b) With respect to the First Claim, awarding plaintiff treble damages under RICO;

(c)  Awarding compensatory damages in favor of plaintiff against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(d) Awarding plaintiff punitive damages in an amount to be determined at trial;

(e) Ordering that the indemnity agreement is declared null and void;

(f)  Awarding plaintiff his reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(g)  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 30, 2002

**MILBERG WEISS BERSHAD
HYNES & LERACH ~~LLP~~**

By: _____
Kenneth J. Vianale
Fla. Bar No. 169668
E-mail: kjv@mwbhlny.com
5355 Town Center Road, Suite 900
Boca Raton, FL  33486
Tel: (561) 361-5000
Fax: (561) 367-8400

-and-

Steven G. Schulman
Samuel H.  Rudman
One Pennsylvania Plaza - 49th Floor
New York, NY  10119
(212) 594-5300

**Attorneys for Plaintiff**

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

# 02 - 81166

CIV-MIDDLEBROOKS

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I.

**(a) PLAINTIFFS**
PETER T. LOFTIN

FILED

**DEFENDANTS**
KPMG LLP, FIRST UNION NATIONAL BANK/WACHOVIA, QA INVESTMENTS LLC and QUELLOS GROUP LLC

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Palm Beach
(EXCEPT IN U.S. PLAINTIFF CASES)

DEC 30 202

USDC / SDFL

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

MAGISTRATE JUDGE
VITUNAC

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
**Milberg Weiss Bershad Hynes & Lerach LLP**
5355 Town Center Road, Suite 900
Boca Raton, FL 33485
Tel: 561-361-5000

ATTORNEYS (IF KNOWN)

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:   DADE,   MONROE,   BROWARD,   (PALM BEACH)   MARTIN, ST. LUCIE,   INDIAN RIVER,   OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)                                AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in This State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to district Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – Med. Malpractice | B ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury – Product Liability | B ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | B ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | ☐ 368 Asbestos Personal Injury Product Liability | B ☐ 640 R R & Truck | | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | B ☐ 650 Airline Regs | | ☒ 470 Racketeer Influenced and Corrupt Organizations |
| B ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | B ☐ 660 Occupational Safety/Health | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | B ☐ 690 Other | | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | | | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | | | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | | | ☐ 892 Economic Stabilization Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | | | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | B ☐ 510 Motions to Vacate Sentence | **A LABOR** | **A PROPERTY RIGHTS** | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS** | ☐ 710 Fair Labor Standards Act | ☐ 820 Copyrights | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | B ☐ 530 General | ☐ 720 Labor/Mgmt Relations | ☐ 830 Patent | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | A ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 840 Trademark | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | B ☐ 540 Mandamus & Other | ☐ 740 Railway Labor Act | **B SOCIAL SECURITY** | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | B ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation | ☐ 861 HIA (1395ff) | A OR B |
| | | B ☐ 555 Prison Condition | A ☐ 791 Empl Ret Inc Security Act | ☐ 862 Black Lung (923) | |
| | | | | ☐ 863 DIWC/DIWW (405(g)) | |
| | | | | ☐ 864 SSID Title XVI | |
| | | | | ☐ 865 RSI (405(g)) | |
| | | | | **FEDERAL TAX SUITS** | |
| | | | | A ☐ 870 Taxes (U S Plaintiff or Defendant) | |
| | | | | A ☐ 871 IRS – Third Party 26 USC 7609 | |

## VI. CAUSE OF ACTION (CITE THE U S CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

18 U.S.C. §§ 1962, et. seq.; and supplemental common law claims

LENGTH OF TRIAL
via ___ days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:
DEMAND $
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

CHECK YES only if demanded in complaint
JURY DEMAND:   ☐ YES   ☒ NO

## VIII. RELATED CASE(S) (See instructions):
IF ANY
JUDGE _____   DOCKET NUMBER _____

DATE
**December 30, 2002**

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY
RECEIPT # 717820   AMOUNT $150.00   APPLYING IFP _____   JUDGE Middlebrooks   MAG. JUDGE Vitunac